IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **DAVID P. LEIBOWITZ, as Chapter 7 Trustee of IFC Credit Corporation,** | Case No. 12-cv-01536 |
| | (Bankruptcy Case No. 09 B 27094) |
| Plaintiff, | |
| v. | |
| | Judge Joan H. Lefkow |
| **RUDOLPH D. TREBELS and MARC LANGS,** | |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

David Leibowitz ("the Trustee") filed a motion to enforce a settlement agreement between Rudolph Trebels, Marc Langs, and Greenwich Insurance ("Greenwich") (collectively "the parties"). (Dkt. 30). Trebels and Langs oppose the Trustee's motion arguing that the parties never settled the case. On September 21, 2012, the court held an evidentiary hearing to determine whether the parties had reached a settlement agreement.

## BACKGROUND

**The Lawsuit**

On July 27, 2009, IFC Credit Corporation ("IFC") filed a petition for relief under chapter 7 of the Bankruptcy Code, 11 U.S.C. § 701 *et seq.*, in the United States Bankruptcy Court for the Northern District of Illinois (Case No. 09 B 27094). Trebels was the president and chief executive officer of IFC. Langs served as the company's chief financial officer. On April 30, 2010, the Trustee filed suit against Trebels and Langs, alleging that they breached their fiduciary duties as officers of IFC, committed fraud, and were liable to the estate for unjust enrichment. Greenwich had issued Trebels and Langs a $5 million directors and officers liability policy

("D&O policy") and agreed to defend Trebels and Langs against the Trustee's claims. The policy is a "wasting insurance policy" such that the ongoing costs of defense are subtracted from the total available payout under the policy. (Trustee's Mot., at 2.) The policy, as amended, authorizes Greenwich to enter into settlements with the consent of its insureds.

**The Settlement Negotiations**

On May 23, 2012, the Trustee, Greenwich, Trebels and Langs[1] had a settlement conference. The parties did not reach a settlement but continued to discuss a price at which both sides would agree to resolve the matter. On May 25, 2012, Langs emailed Trebels and the Trustee that he and Trebels had received approval to make a settlement proposal for $900,000. On May 30, 2012, the Trustee rejected the offer noting that the "proposal is for inadequate consideration." (Dkt. 37, Ex. 5.) The Trustee attached to its reply email a draft settlement "Term Sheet" and wrote that the Term Sheet "incorporates the only terms under which the Trustee will continue to discuss settlement." (*Id.*)

The Term Sheet contained 11 terms: term (1), an amount and time for payment; terms (2) - (4) and (9), the releases of the respective parties; term (5), acknowledgment that the parties would execute a final written settlement agreement incorporating the terms of the Term Sheet and that settlement would be conditional on the bankruptcy court's approval; terms (6) - (7), dismissal of specified pending litigation, including the Trustee's avoidance action against Trebels; term (8), reservation of Greenwich's rights; term (10), reservation of the Trustee's

---

[1] The court refers to the parties by their names instead of by the names of the attorneys who represent them. For reference, David Goodman and Ira Bodenstein are counsel for the Trustee; John Duchelle is counsel for Greenwich; Michael O'Rourke, Michael Moody, and Myles O'Rourke are counsel for Trebels; and Timothy Touhy and Dan Touhy are counsel for Langs.

rights; and term (11), allowance of "other usual and customary terms of settlement as the Parties may agree."

The negotiations continued during the next two months. Counsel for Greenwich, John Duchelle, testified at the hearing that, on July 17, 2012, he received a telephone call from Langs, who advised that he and Trebels were willing to settle for $975,000 and the term sheet. Counsel for Greenwich testified that he needed approval from Trebels, and Langs agreed that Trebels would confirm. On July 21, 2012, Trebels confirmed, emailing Greenwich that he and Langs agreed to increase the settlement offer to $975,000,

> In accordance with your request and your authority from Greenwich, Rudy Trebels has agreed with Marc Langs to increase the settlement offer to the Trustee to $975,000, for full dismissal of the Trustee case, full mutual releases regarding that case, and dismissal of Rudy Trebels, Trebels family members, and Trebels-related entities from the Avoidance actions. This is a bottom-line offer and we will not agree to any further increase (nor to any holdback for any other insured). Please also advise the Trustee that this offer shall remain open until close of business, Tuesday, July, 24.

(Dkt. 30, Ex. 2.) Greenwich called the Trustee about the offer and, at the Trustee's request, Greenwich forwarded Trebels's email to the Trustee. On July 24, 2012, the Trustee replied to Greenwich accepting "the settlement offer from Trebels and Langs as it has been communicated to us by you on behalf of them and on behalf of Greenwich." (*Id.*) The Trustee continued,

> As you are aware, the settlement is something that will require court approval. Further, it is our understanding that the settlement is going to be on the terms incorporated in the term sheet that was circulated in May in conjunction with the mediation (except that the dollar amount of the settlement will be $975,000). We will need to get the settlement documented and assume that Defendants will take the first stab at that. Please confirm that our understanding is consistent and let us discuss the logistics of getting the settlement documented and executed.

(*Id.*)

The next day, on July 24, 2012, Greenwich emailed Trebels and Langs indicating that the Trustee had agreed in principle to the deal and requested that they send a redline incorporating their revisions into the May 2012 Term Sheet circulated by the Trustee. Over the next several days, Trebels, Langs, and Greenwich incorporated their revisions into the Term Sheet, which Greenwich then sent to the Trustee. On July 31, 2012, Trebels sent the Trustee further revisions to the Term Sheet.

Later on July 31, 2012, the Trustee responded noting that the revised Term Sheet "broaden[ed] the settlement beyond the terms" accepted by the Trustee. (Dkt. 37, Ex. 4.) The Trustee took particular issue with Paragraph 9 regarding privileged emails (a term which had not been included in the May 2012 Term Sheet nor had it been discussed between the parties prior to that time).[2] In Paragraph 9, Langs sought the return and destruction of two emails that he had sent to a criminal defense attorney named Patrick Cotter ("the Cotter emails") using an IFC-

---

[2] Paragraph 9 provided,

> The parties acknowledge that Trebels and Langs received legal advice from various counsel in connection with one or more of the pending claims and have asserted that these communications are privileged attorney-client communications. Upon execution of this term sheet by the parties, the trustee and its counsel shall immediately deliver to counsel for Trebels and Langs all communications created, sent or received by Patrick Cotter and the firm of Monico, Spevack and Pavich. The trustee and its counsel shall destroy all originals and copies of any such data, paper and electronic communications and shall not disseminate or disclose such data to any person. Communications shall include any communication, whether paper, electronic or otherwise.

(Dkt. 37, Ex. 4.)

4

owned device.³  The Trustee had access to the Cotter emails because they were stored on IFC's computer server.

Several days after receiving the revised Term Sheet, the Trustee followed-up explaining that he had accepted the settlement embodied in the July 21, 2012 email forwarded by Greenwich from Trebels, and that the revised Term Sheet circulated by Trebels, Langs, and Greenwich was only a "formality" to effectuating the parties' agreement.  (Dkt. 37, Ex. 5.)  Langs responded that no settlement had taken place because a settlement necessarily required a "meeting of the minds," which the parties were still working towards.  (Dkt. 37, Ex. 5.)  Counsel for Greenwich explained during his testimony that the parties needed a signed Term Sheet or formal settlement agreement to present to the bankruptcy court so that it could make a fairness determination.  Greenwich also took issue with the Trustee's position, writing that the Trustee's argument that the earlier email correspondence obviated the need for a settlement agreement was "frankly absurd."  (Dkt. 37, Ex. 5.)

After several weeks of "back and forth" between the parties regarding whether a settlement had actually taken place, the Trustee emailed all the parties reiterating that the parties' email correspondence evidenced a binding settlement agreement while further indicating that he would agree to the revised Term Sheet circulated with the exception of Paragraph 9.  The Trustee additionally informed the parties that it had produced the Cotter emails to the

---

³ On May 11, 2011, the Trustee included the Cotter emails in a 145-page document production to Trebels and Langs.  The emails related to IFC's negotiations with its lenders prior to the bankruptcy filing.  After this disclosure, neither Trebels nor Langs requested that the Cotter emails be returned to them.  In November 2011, the Trustee identified the Cotter emails in a pre-trial disclosure as documents that he intended to introduce as evidence during trial.  Langs objected to the use of the Cotter emails based on the attorney-client privilege but did not request that the emails be returned.  Langs's primary concern with adding Paragraph 9 to the Term Sheet appears to be that dissemination of the Cotter emails may expose him to additional litigation.

government "long ago."  (Dkt. 32, Ex. 2.)  Langs responded, demanding that the Trustee return and destroy any privileged information (*i.e.*, the Cotter emails).  Langs further maintained that he never saw Trebels's July 21, 2012 email giving Greenwich authority to settle the matter for $975,000.  Trebels also responded shortly thereafter contending that he sent the July 21, 2012 email only on his own (not Langs's) behalf and that he had no authority to commit Langs to a settlement agreement.

## ANALYSIS

I.      The Trustee's Motion to Enforce the Settlement Agreement

Whether the parties knowingly and voluntarily entered into a settlement agreement is a question of fact.  *Glass* v. *Rock Island Refining Corp.*, 788 F.2d 450, 455 (7th Cir. 1986).  A district court has the power to enforce a settlement agreement in a case pending before it.  *Wilson* v. *Wilson*, 46 F.3d 660, 664 (7th Cir. 1995).  The court should hold an evidentiary hearing where material facts concerning the existence of a settlement agreement are in dispute.  *Id.*  The court, having conducted an evidentiary hearing, must determine whether the parties entered into a settlement agreement.  This determination hinges on whether (1) Langs authorized Greenwich to communicate a settlement offer; (2) the offer incorporated the Term Sheet; or (3) negotiations remained open so as to permit Langs to insert Paragraph 9 as an additional term of the agreement, such that the Trustee's refusal of Paragraph 9 defeated the settlement.

      A.      **Whether Langs Authorized Greenwich to Communicate A Settlement Offer**

A settlement agreement is a contract and must contain an offer, acceptance, and consideration to be enforceable.  *Taylor* v. *Gordon Flesch Co.*, 793 F.2d 858, 862 (7th Cir. 1986).  The court will apply Illinois law as state law governs "[i]ssues regarding the formation,

6

construction, and enforcement of settlement agreements." *Magallanes* v. *Ill. Bell Telephone Co.*, 535 F.3d 582, 584 (7th Cir. 2008).[4] The burden is on the Trustee to show that Greenwich had the authorization to settle the matter on behalf of Langs. *Id*.

Langs argues that he hired his own attorney because his interests were divergent from those of Greenwich. According to Langs, Greenwich did not speak for him and lacked authority to bind him to a settlement. While Langs now tries to distance himself from Greenwich, the D&O policy authorized Greenwich to settle matters on Langs's behalf with his consent. Although Langs had separate counsel to negotiate his unique interests, an agency relationship also existed between Langs and Greenwich as it also acted on his behalf vis-a-vis the Trustee. *See Santana* v. *State Bd. of Elections*, 864 N.E. 2d 944, 952, 371 Ill. App. 3d 1044, 309 Ill. Dec. 703 (Ill. App. Ct. 2007) ("An agency is a fiduciary relationship in which the principal has the right to control the agent's conduct and the agent has the power to act on the principal's behalf."); *see also Petrovich* v. *Share Health Plan of Ill.*, 719 N.E.2d 756, 765, 188 Ill. 2d 17, 241 Ill. Dec. 627 (Ill. 1999) ("[A] principal will be bound not only by the authority that it actually gives to another, but also by the authority that it appears to give.").

---

[4] Langs argues that federal law applies to this dispute because the court's jurisdiction rests on federal bankruptcy law. The dispute before the court is whether the parties entered into a binding settlement agreement. As contract formation is a question of state law, *Pohl* v. *United Airlines, Inc.*, 213 F.3d 336, 338 (7th Cir. 2000), Illinois law applies. *Herron* v. *City of Chicago*, 618 F. Supp. 1405, 1409 (N.D. Ill. 1985) ("The interpretation of a settlement agreement is controlled by state law governing contracts generally.").

7

The issue then is whether Greenwich's offer to the Trustee (communicated through Trebels) also bound Langs. Langs's position that he never knew about the offer is belied by Greenwich's counsel's testimony that Langs, in a July 17, 2012 telephone conversation, authorized Greenwich to settle for $975,000. The parties' subsequent email correspondence further undercuts Langs's position. Trebels's July 21, 2012 email to Greenwich stated,

> In accordance with your request and your authority from Greenwich, Rudy Trebels has agreed with Marc Langs to increase the settlement offer to the Trustee to $975,000, for full dismissal of the Trustee case, full mutual releases regarding that case, and dismissal of Rudy Trebels, Trebels family members, and Trebels-related entities from the Avoidance actions.

(Dkt. 30, Ex. 4.) Greenwich then communicated that offer to the Trustee, which it was permitted to do because the D&O policy authorized Greenwich to enter into settlements with the consent of its insureds. Trebels and Langs now argue that only Trebels agreed to increase the settlement proposal to $975,000. Neither of them, however, explains why Trebels stated that he and Langs made the offer, or why they failed to object when, on July 24, 2012, Greenwich informed them both via email that the Trustee had agreed to resolve the case for $975,000.

After receiving news that the Trustee had accepted the offer, instead of inquiring about why Greenwich made an unauthorized offer, Langs began revising the Term Sheet circulated earlier in May 2012. At a minimum, Langs's failure to object or even inquire about the offer, and his subsequent participation in drafting the Term Sheet lends credence to the Trustee's position that Langs knew of and authorized conveyance of the offer. *See*, *e.g.*, *Szymkowski* v. *Szymkowski*, 432 N.E.2d 1209, 1211, 104 Ill. App. 3d 630, 60 Ill. Dec. 310 (Ill. App. Ct. 1982) ("[W]here a party silently stands by and permits her attorney to act in her behalf in dealing with another in a situation where the attorney may be presumed to have authority, the party is

8

estopped from denying the agent's apparent authority as to third persons."); *Petrovich*, 719 N.E.2d at 765 ("Where the principal creates the appearance of authority, a court will not hear the principal's denials of agency to the prejudice of an innocent third party, who has been led to reasonably rely upon the agency and is harmed as a result."). The court finds that Langs is bound by the July 21, 2012 offer that Trebels communicated to Greenwich, which Greenwich then sent to the Trustee.

### B. Whether the Parties Conditioned their Agreement on a Written Executed Document

The parties dispute whether they conditioned their agreement on an executed document. Settlement agreements are enforceable even if the parties contemplated later reducing the agreement to writing. *Ceres Ill., Inc.* v. *Ill. Scrap Processing, Inc.*, 500 N.E. 2d 1, 5, 114 Ill. 2d 133, 102 Ill. Dec. 379 (Ill. 1986). If the parties, however, understand that "execution of a formal document shall be a prerequisite to their being bound there is no contract until the document is executed." *Lambert Corp.* v. *Evans*, 575 F.2d 132, 135 (7th Cir. 1978). Still, "[e]ven where the parties contemplate the execution of a written release or stipulation, this writing need not be a condition precedent to a valid settlement agreement." *Lampe* v. *O'Toole*, 685 N.E. 2d 423, 425, 292 Ill. App. 3d 144, 226 Ill. Dec. 320 (Ill. App. Ct. 1997) (rejecting the plaintiffs' argument that "because any agreement was purely executory, they could repudiate it any time."). "Whether the parties intended to condition a settlement on the execution of a writing is a question of fact." *Lampe*, 685 N.E. 2d at 425.

Langs argues that an executed document was necessary because the court ultimately needed to approve the parties' agreement. The May 2012 Term Sheet and the revised July 2012 Term Sheet both explicitly contemplate executing a formal document incorporating their

9

agreement because it would need court approval.[5] But this does not necessarily mean that the agreement was conditional on execution of a writing. The evidence demonstrates that the parties expected to agree on terms, to commit the agreement to writing, and then to submit it to the court for approval. The offer conveyed by Greenwich to the Trustee on July 21, 2012 reflects that it was based on terms of the Term Sheet most important to Trebels and Langs: the amount to be paid (term 1); the execution of releases (terms 2, 4, and 9); and dismissal of specified pending litigation, including the Trustee's case, and dismissal of Trebels-related parties from the avoidance action (terms 6 and 7). There was no controversy at the time concerning the other terms on the Term Sheet nor has any arisen since. In other words, the parties contemplated that the Term Sheet with the increased payment amount was the offer that the Trustee accepted on July 24, 2012. *See Elustra* v. *Mineo*, 595 F.3d 699, 709 (7th Cir. 2010) (noting how the parties could have stated that "no agreement would be final until it was in writing, or until the [magistrate judge's] checklist was completed" if they wished to impose such conditions); *Love* v. *Ill. Bell*, 210 Fed. Appx. 516, 518 (7th Cir. 2006) ("But an oral agreement to settle is enforceable–even if the parties expect to later reduce it to writing–unless a party conditions its acceptance on the execution of a written agreement."); *Dawson* v. *Gen. Motors Corp.*, 977 F.2d 369, 374 (7th Cir. 1992) ("The fact that a formal written document is anticipated does not preclude enforcement of a specific preliminary promise.").

---

[5] The May 2012 Term Sheet provided: "It is understood and agreed that, subject to (i) the Parties' execution of a final written settlement agreement incorporating the terms described in this document and (ii) obtaining bankruptcy court approval of the final written settlement agreement . . ." (Dkt. 37, Ex. 5). The July 2012 revised Term Sheet provided: "It is understood and agreed that this term sheet is, subject to (i) the Parties' execution of a final written settlement agreement incorporating the terms described in this document and (ii) obtaining court approval of the final written settlement." (*Id.*)

The court thus finds that the parties reached an agreement on July 24, 2012, which was not conditional on the execution of a writing. Nor were additional negotiations anticipated other than "usual and customary terms of settlement as the Parties may agree." The agreement was indeed conditional on the court's approval, but that was a contingency outside the parties' control. Neither was execution of a written document necessary to obtaining the court's approval. *See*, *e.g.*, *Steadfast Ins. Co.* v. *Auto Marketing Network, Inc.*, No. 97 C 5696, 2004 WL 906118, at *4 n.2 (N. D. Ill. April 28, 2004) ("This court's own experience in a bankruptcy court suggests that where the parties in interest are in agreement, settlements can be announced on the record and approved rather unceremoniously.")

This conclusion is reinforced because the record fails to demonstrate that Langs ever inserted the Cotter emails into the negotiations before the July 21, 2012 offer was conveyed and accepted. "Whether a meeting of the minds occurred depends on the parties' objective conduct, not their subjective beliefs." *Dillard* v. *Starcon Int'l., Inc.*, 483 F.3d 502, 507 (7th Cir. 2007); *see also Laserage Tech. Corp.* v. *Laserage Labs., Inc.*, 972 F.2d 799, 802 (7th Cir. 1992) ("[I]n assessing [the parties'] intent, their [s]ecret hopes and wishes count for nothing because the status of a document as a contract depends on what the parties express to each other and to the world, not what they keep to themselves.") (internal quotation marks omitted). The May 2012 Term Sheet does not reflect the Cotter emails. Similarly, in their July 2012 email correspondence, the parties did not address the Cotter emails. As Langs is the one claiming privilege for these emails, the onus was on him to voice a concern about returning them before the offer was conveyed. *See Dillard*, 483 F.3d at 508 ("The materiality of additional written terms introduced after an oral agreement is reached is not established simply by one party's

intransigence or refusal to budge on the new terms.") (internal quotation marks omitted); *Steadfast Ins. Co.*, 2004 WL 906118, at *4 ("If [the plaintiff] wanted a confidentiality clause, it should have made it known during the negotiations."). The Trustee could have but did not agree to entertain another material term at that point. In short, Langs's failure to timely raise the issue defeats his argument.[6]

## **CONCLUSION**

The Trustee's motion to enforce the settlement agreement reached by the parties on July 24, 2012 [dkt. 30] is granted. The court directs the parties to execute an agreement consistent with their email exchanges, omitting Paragraph 9. The Trustee's request for attorneys' fees is denied.

Dated: November 14, 2012     Enter: _____
                                    JOAN HUMPHREY LEFKOW
                                    United States District Judge

---

[6] During the evidentiary hearing, Langs raised other terms still being discussed by the parties after the Trustee accepted the offer on July 24, 2012: (1) personal property tax liabilities; (2) indemnity of third parties; (3) release of third parties; and (4) release of shareholders. Unlike the Cotter emails, these terms (other than tax liabilities) were contemplated by the Term Sheet. Moreover, counsel for Greenwich testified that the parties ultimately reached an agreement on these issues. Such negotiations were contemplated by term 11 of the Term Sheet.

12